NOT DESIGNATED FOR PUBLICATION

No. 120,215

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

THOMAS L. WILSON,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; TERRY L. PULLMAN, judge. Opinion filed November 22, 2019. Affirmed.

*Gerald E. Wells*, of Jerry Wells Attorney-at-Law, of Lawrence, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., BRUNS, J., and WALKER, S.J.

PER CURIAM: Following a remand from this court, Thomas L. Wilson appeals the district court's decision denying his ineffective assistance of counsel claim against the attorney who represented him in his first K.S.A. 60-1507 proceeding. Wilson argues the district court erred in finding there was no substantial risk that a conflict of interest substantially affected his attorney's representation. Finding no error, we affirm the district court.

1

FACTUAL AND PROCEDURAL BACKGROUND

The facts relevant to this appeal are set forth in this court's opinion in *Wilson v. State*, No. 112,558, 2015 WL 8590325, at *1-2 (Kan. App. 2015) (unpublished opinion):

"On May 13, 2008, a jury convicted Wilson of aggravated robbery. Wilson appealed the verdict, which was affirmed on direct appeal to this court. *State v. Wilson*, No. 101,459, 2010 WL 653126 (Kan. App. 2010) (unpublished opinion), *rev. denied* 290 Kan. 1104 (2010). Wilson then filed his first habeas corpus action under K.S.A. 60-1507. See *Wilson v. State*, No. 107,490, 2013 WL 2918569 (Kan. App.) (unpublished opinion), *rev. denied* 298 Kan. 1209 (2013). The facts of his first unsuccessful K.S.A. 60-1507 motion are relevant to this appeal:

"On February 14, 2011, Wilson filed his first K.S.A. 60-1507 motion in the district court. He alleged his trial counsel, Alice Osburn, was ineffective. Pamela Parker represented Wilson at the motion hearing. On August 26, 2011, Wilson had learned that Parker's boss, Charles S. Osburn, was married to Alice Osburn. Parker acknowledged the relationship in a letter to Wilson, which stated, 'In response to your correspondence from earlier this week, yes, [Charles S. Osburn] and Alice Osburn are related. This is in no way a conflict however as Ms. Osburn does not work in this office.'

"On October 31, 2011, the district court held an evidentiary hearing on Wilson's claim that Alice Osburn had been ineffective for failing to call a certain witness at trial. The district court denied Wilson relief on his first K.S.A. 60-1507 motion on December 5, 2011.

"On June 7, 2013, this court affirmed the denial of Wilson's first K.S.A. 60-1507. He had also sought to raise a claim that Parker was ineffective for the first time on appeal. *Wilson*, 2013 WL 2918569, at *7-8. Wilson claimed Parker had been ineffective for multiple reasons, none of which mentioned an alleged conflict of interest based on the relationship between Alice Osburn and Charles S. Osburn. The *Wilson* court declined to rule on the merits of the issue and affirmed the district court. 2013 WL 2918569, at *1. On October 29, 2013, the Kansas Supreme Court denied Wilson's petition for review of the denial of his first K.S.A. 60-1507 motion.

"On April 14, 2014, Wilson filed his second K.S.A. 60-1507 motion pro se, the motion at issue in this appeal. Wilson alleged Parker was ineffective because of the

2

relationship between Parker's boss, Charles S. Osburn, and Wilson's trial counsel, Alice Osburn. He claimed the Osburns are married and alleged this created a conflict of interest for Parker. Wilson alleged Parker 'did not fully investigate or put full effort into prosecuting my petition against Alice Osburn in fear of reprisal from or to gain favoritism from her boss.' He attached the August 26, 2011, letter from Parker to his petition. Wilson described the letter as 'Parker's response to me when I expressed my concerns over her and the Sedg. Co. Publ. Def. Office representing me due to a clear conflict of interest.' Wilson claimed he had not raised this issue below because '[i]t did not occur until appointment of Pamela Parker to my 60-1507 petition.'

"On July 10, 2014, the district court denied Wilson's motion summarily, finding he had 'failed to state a claim that is supported by argument beyond conclusory allegations.'"

On appeal of the summary denial of his second K.S.A. 60-1507 motion, Wilson argued that his claim for relief was not conclusory and requested an evidentiary hearing to determine whether Parker had provided effective assistance of counsel during his first K.S.A. 60-1507 proceedings. After a review of the facts and law applicable to the case, a panel of our court found that Wilson had presented a viable argument that Parker's representation may have been materially limited by her interest in not showing improper conduct by his trial counsel, Alice Osburn, the wife of Parker's boss. As a result, the panel remanded the case for an evidentiary hearing to determine whether there was a 'substantial risk' that Parker's representation of Wilson on his first K.S.A. 60-1507 motion might have been materially limited under these circumstances. 2015 WL 8590325, at *4.

In accord with our mandate, the district court conducted an evidentiary hearing during which it heard testimony from Wilson and attorney Parker.

At the hearing, Wilson testified that Parker had represented him in his first K.S.A. 60-1507 case where he alleged that Alice Osburn had provided ineffective representation by failing to call certain witnesses to testify at trial. Wilson said that when Parker began representing him, she was employed at a private firm. Parker changed jobs at some point

3

during the representation and began working at the Public Defender's Office in Sedgwick County. Wilson testified that Parker notified him of the job change by letter. Wilson noticed that the letterhead listed Charles Osburn as the chief public defender for Sedgwick County, so he wrote to Parker to ask if Charles and Alice Osburn were related. Parker responded to Wilson, and in her letter explained that Charles and Alice were related but that there was no conflict because Alice and Parker did not work for the same office.

Wilson testified that he relied on Parker's representation that there was no conflict or concern with her representation and did not learn that Charles and Alice were married until after the evidentiary hearing on his first K.S.A. 60-1507 case at which he was represented by Parker. Wilson stated that if he had known of the Osburns' marriage, he would have asked for Parker's removal from his case. Wilson said that he would not have felt comfortable with Parker representing him because he believed that she could not perform the job to the best of her ability and that she would have a difficult time alleging that her boss's wife was ineffective or incompetent.

Wilson also claimed that Parker did not seek any information from him that would have helped her prepare for the evidentiary hearing and met with him only once in person just before the hearing. At that time, Wilson did not believe that Parker had completed her investigation or spoken to any of the relevant witnesses. According to Wilson, Parker told him that the judge was not going to rule in his favor and encouraged him not to go forward with the hearing because it was "basically useless." Wilson alleged that Parker did not investigate the relevant witnesses and failed to represent him due to the conflict presented by the Osburns' marriage. Wilson testified that he filed a complaint against Parker with the Office of the Disciplinary Administrator but admitted that the claim was unsuccessful.

4

Parker's testimony painted a starkly different picture. Parker testified that she was an associate attorney at a private law firm when she was initially appointed to handle Wilson's first K.S.A. 60-1507 case. She later began working at the Sedgwick County Public Defender's Office in July 2011, and Wilson's evidentiary hearing took place in October 2011. Parker recalled that the October hearing was for the limited issue of determining whether Alice Osburn had been ineffective in failing to call Lorenzo Hawkins to testify at trial. Parker testified that she did not conduct an independent investigation of Hawkins but knew that Alice had hired a private investigator who interviewed Hawkins. In preparation for the hearing, Parker reviewed the case file and trial transcripts, spoke with Alice, and reviewed the investigator's report on Hawkins. Parker stated that Alice and the investigator's report both indicated that Hawkins would not be a good witness for Wilson. Parker understood that Alice had made a strategic decision to not present Hawkins' testimony at trial.

Parker confirmed that she communicated with Wilson mainly through written correspondence and that she did meet with him in person before the evidentiary hearing. Parker said that she and Wilson discussed Alice's expected testimony and the investigator's report. Based on this evidence, Parker told Wilson of her belief that his claim would not succeed and she suggested that he withdraw it. Parker did not believe that any further investigation would have changed the outcome of the case.

Parker also testified that Charles Osburn was her direct supervisor at the Public Defender's Office. But Parker denied that Charles' marriage to Alice had any effect on her representation of Wilson. Parker further denied that her employment at the Public Defender's Office while representing Wilson changed how she viewed his case. Parker explained that her work on Wilson's case was separate from her other work at the Public Defender's Office. Parker said that she did not talk to Charles or anyone else in the office about Wilson's case, and she never felt any pressure to perform other than her best while representing Wilson. Parker noted that Wilson never asked for Parker to be removed from

the case due to the Osburns' marriage. Parker could not recall if she and Wilson specifically discussed that the Osburns were married. But Parker said that she had no reason to keep that information from Wilson because there was no conflict of interest. She testified that if there had been a conflict, she would have removed herself from the case. But Parker did not believe that any conflict existed during her representation of Wilson or that her representation even raised the appearance of impropriety. Parker was unaware of any ethical rules she violated by representing Wilson and noted that she was never sanctioned by the Disciplinary Administrator.

Following testimony from the witnesses and oral argument from the parties, the district court denied Wilson's ineffective assistance of counsel claim. In finding that no conflict of interest existed during Parker's representation of Wilson, the judge noted he had known Parker for many years and had always found her to be "very honest, very accurate in her statements and representations of fact in law and very credible." Based on the evidence before it, including Parker's work on the case and the evidence presented at trial and at both evidentiary hearings, the district court concluded that while the Osburns' marriage could create the appearance of a conflict of interest, there was no substantial risk that it had materially limited Parker's representation of Wilson. Wilson filed this timely appeal of the district court's ruling.

ANALYSIS

Wilson argues that the district court erred in denying his ineffective assistance of counsel claim based on Parker's alleged conflict of interest. The State responds that Wilson failed to establish the existence of an active conflict of interest.

Challenges involving claims of ineffective assistance of counsel present mixed questions of fact and law. When the district court holds a full evidentiary hearing, as the district court did in this case, we must review the district court's factual findings to

6

determine whether those findings are supported by substantial competent evidence. Our review of the district court's legal conclusions regarding whether counsel was ineffective is de novo. *State v. Butler*, 307 Kan. 831, 853, 416 P.3d 116 (2018).

"[A]lthough 'there is no constitutional right to effective assistance of legal counsel on collateral attacks because they are civil, not criminal actions,' Kansas does under some circumstances 'provide a *statutory* right to counsel on collateral attack.'" *Mundy v. State*, 307 Kan. 280, 294-95, 408 P.3d 965 (2018). K.S.A. 22-4506(b) provides a statutory right to counsel where the district court finds that an indigent movant's K.S.A. 60-1507 motion presents substantial questions of law or triable issues of fact. Once "counsel is appointed by the court in postconviction matters, the appointment should not be a useless formality." *Brown v. State*, 278 Kan. 481, 484, 101 P.3d 1201 (2004).

The Kansas Supreme Court has adopted the three classifications of ineffective assistance of counsel claims identified in *Mickens v. Taylor*, 535 U.S. 162, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002). The first category includes claims that an attorney's performance was deficient to the point a defendant was denied a fair trial; the second category consists of those cases when the "assistance of counsel has been denied entirely or during a critical stage of the proceeding"; and the third applies to situations when a defendant's attorney "actively represented conflicting interests." *State v. Galaviz*, 296 Kan. 168, 181-82, 291 P.3d 62 (2012) (quoting *Mickens*, 535 U.S. at 166). Obviously, Wilson's claim falls squarely under the third category.

The third category is further divided into three subgroups, which our Supreme Court has referred to as "(1) the automatic reversal exception, (2) the adverse effect exception, and (3) the *Mickens* reservation." *State v. McDaniel*, 306 Kan. 595, 608, 395 P.3d 429 (2017). The three conflicting interest subcategories require the defendant to establish his or her attorney had an active conflict of interest. In the first two subgroups, the alleged conflict is related to an attorney engaging in multiple, concurrent

representations. The third subgroup involves cases of successive representation or conflicts related to an attorney's personal or business interests. *Galaviz*, 296 Kan. at 182.

Wilson's claim falls directly within this third subgroup, since he alleges that Parker actively represented conflicting interests:  Parker's duty of fidelity to her client, Wilson, versus her duty of loyalty to her supervisor, Charles Osburn. And because this case involves an alleged conflict of Parker's personal or business interests, as opposed to concurrent representation, it is within the third subgroup—the *Mickens* reservation. The test to determine whether a defendant is entitled to relief in *Mickens* reservation cases was left open by the United States Supreme Court in *Mickens*. *Galaviz*, 296 Kan. at 184. Our Supreme Court has explained:

> "[O]ne of two standards would apply. The first is the *Strickland* [*v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)] standard, under which relief would not be granted unless the defendant could demonstrate both that the attorney's performance was deficient and a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.
>
> "The alternative is the *Cuyler* [*v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980)] standard used in the adverse effect exception. Under the *Cuyler* test, the defendant must demonstrate counsel labored under an active conflict of interest that affected the adequacy of the representation. This test differs from the *Strickland* standard in that '"prejudice will be presumed only if the conflict has significantly affected counsel's performance—thereby rendering the verdict unreliable, even though *Strickland* prejudice cannot be shown."' [Citations omitted.]" *McDaniel*, 306 Kan. at 610.

Without discussion, the Kansas Supreme Court has applied the adverse effect exception to cases that fall within the *Mickens* reservation subcategory. See, e.g., *State v. Prado*, 299 Kan. 1251, 1260, 329 P.3d 473 (2014); *Boldridge v. State*, 289 Kan. 618, 627-28, 215 P.3d 585 (2009).

8

Under the *Cuyler* test, Wilson must show "'both an actual conflict of interest and an adverse effect.'" *Mickens*, 535 U.S. at 165. To that end, Wilson argues that Parker had a personal interest in not establishing improper conduct by Alice Osburn because Alice was married to Parker's boss, Charles Osburn. Wilson asserts that the district court's reliance on Parker's character and credibility in concluding there was no conflict was improper, since Parker's character and credibility were irrelevant to the determination of whether there was a substantial risk that the Osburns' marriage had materially limited Parker's representation of Wilson. As evidence of Parker's materially limited representation, Wilson alleges that she put little time and effort into preparing for the evidentiary hearing, she conducted no independent investigation of Hawkins, and she encouraged Wilson to abandon his ineffective assistance of counsel claim against Alice Osburn. Wilson also suggests that Parker had a financial incentive to continue representing Wilson, rather than withdraw because of a conflict.

Contrary to Wilson's arguments, there was no evidence presented to the district court of any active conflict between Parker and Wilson. In the course of our review we do not reweigh the evidence, reassess the credibility of the two witnesses at the hearing, or resolve any conflicts in evidence. *State v. Talkington*, 301 Kan. 453, 461, 345 P.3d 258 (2015). Wilson's complaints about Parker's lack of investigation and preparation are more akin to a claim of deficient performance than a conflict of interest. Wilson's assertion that the conflict caused by the Osburns' marriage prevented Parker from investigating or providing adequate representation is also speculative and lacks any support in the record other than Wilson's own testimony.

Notably, the Disciplinary Administrator took no action against Parker after Wilson filed an ethical complaint against her. And Parker testified that her representation of Wilson was completely separate from her work at the Public Defender's Office, that she never spoke to Charles about her representation of Wilson, and that the Osburns' marriage did not influence her representation of Wilson in any way.

9

Parker's attempt to persuade Wilson to withdraw his claim against Alice Osburn was based on Parker's belief that the claim lacked merit; there is no evidence to suggest that it had anything to do with her working relationship with Charles Osburn. The district court found Parker's testimony to be credible on this issue.

Finally, Wilson's claim that Parker had a financial motivation to remain on his case is entirely unsupported by the record. The only evidence presented that related to Parker's compensation for Wilson's case was Parker's testimony on cross-examination where she agreed with defense counsel's statement that if there had been a conflict of interest, she would have been required to remove herself from the case and would no longer receive payment from the Board of Indigents' Defense Services. And any suggestion that Parker wanted to remain on the case for financial reasons conflicts with the undisputed evidence that Parker encouraged Wilson to abandon his claim. In short, Wilson has failed to demonstrate that Parker labored under an active conflict of interest. See *McDaniel*, 306 Kan. at 610.

Moreover, nothing in the record suggests that Parker's representation of Wilson could have had any effect on the outcome of the evidentiary hearing. The lone issue at the hearing was whether Alice Osburn was ineffective for failing to call Hawkins to testify at trial. Relevant testimony from the hearing on this issue is set forth in *Wilson v. State*, No. 107,490, 2013 WL 2918569 (Kan. App. 2013) (unpublished opinion):

> "Wilson's trial attorney, Alice Osburn, testified at the evidentiary hearing. Osburn said that she became aware of Hawkins through the probable-cause affidavit that had been used to support the filing of the criminal complaint. The affidavit said that a police officer had spoken to Hawkins, who told the officer that he was scraping paint on the south side of [the victim James] Mullins' home when he saw a young black male talking to Mullins on the front porch. Hawkins said he didn't pay much attention and went back to his work.

10

"Osburn testified that she hired an investigator to interview Hawkins. The interview occurred only 3 days before trial and after Mullins had passed away. The investigator was present and available to testify at the habeas hearing if needed. Osburn related what the investigator had told her: Hawkins said that he was just leaving for his break when a young man came and spoke to Mullins on the porch. About 20 minutes later, Hawkins returned from his break, and Mullins told him that the man robbed him. Hawkins believed at the time that Mullins was friends with the man. Hawkins said he would recognize the man again and said that he thought the man was the nephew of Mark Wilson, a friend of Mullins, and that the man showed up that day looking for Mark. Hawkins also said that Mullins later received phone calls offering to return the money and jewelry if Mullins didn't testify.

"Based on this information, Osburn decided that Hawkins would not be a favorable witness to call at trial because Hawkins would identify Wilson as being present right before the robbery, would be able to testify that Mullins told him that Wilson was the person who robbed him, and could testify about the possible intimidation of Mullins as a witness due to the phone call.

"Wilson testified that the only discussion about Hawkins he had before trial was when he told Osburn that, from what Wilson read in the police report, Hawkins said he'd never seen Wilson before and that he didn't see a robbery on the day of the crime. Wilson said he discussed with Osburn the possibility of calling Hawkins as a witness because Hawkins did not identify Wilson when he was originally interviewed by a police officer. Wilson said he asked Osburn to call Hawkins as a witness at trial.

"The district court found that the decision to not call Hawkins to testify was objectively reasonable—in fact, it would have actually been harmful to call Hawkins to testify because Hawkins would have further implicated Wilson. The court also noted in its order that Wilson could not show that any prejudice was caused to him even if Hawkins had been called to testify." 2013 WL 2918569, at *3.

The prior panel of our court hearing Wilson's second K.S.A. 60-1507 claim ultimately declined to address the merits of Wilson's ineffective assistance of counsel claim against Parker because he was raising it for the first time on appeal. 2013 WL 2918569, at *10. But the panel noted that "the focus of the evidentiary hearing was Osburn's conduct at trial, not whether Hawkins could identify Wilson from a photo array several years later,"

11

and found that "there was virtually no evidence to suggest that calling Hawkins as a trial witness would have helped Wilson's defense." 2013 WL 2918569, at *8-9.

Certain decisions relating to the control and direction of a criminal case are ultimately for the accused and others are entrusted to defense counsel. Decisions on what witnesses to call rest exclusively with counsel, after consultation with his or her client. *Winter v. State*, 210 Kan. 597, Syl. ¶¶ 1, 2, 502 P.2d 733 (1972). Alice's testimony at the evidentiary hearing demonstrated that her investigator spoke with Hawkins and that Hawkins would not have been a favorable witness for Wilson. Parker testified at the most recent hearing that she learned from Alice and the investigator's report that Hawkins would not have been a good witness for Wilson. Parker explained that Alice had made a strategic decision to not present Hawkins' testimony at trial. If counsel has made a strategic decision after making a thorough investigation of the law and the facts relevant to the realistically available options, then counsel's decision is virtually unchallengeable. *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013). Any additional investigation of Hawkins by Parker would not have changed the result of the evidentiary hearing.

In short, we hold that substantial competent evidence supported the district court's finding that no conflict of interest existed between Parker and Wilson. This in turn supports the district court's legal conclusion that there was no substantial risk that the Osburns' marriage had materially limited Parker's representation of Wilson. As a result, the district court did not err in denying Wilson's ineffective assistance of counsel claim.

Affirmed.

12